87 U.S. 72 (____)
20 Wall. 72
NATIONAL BANK OF WASHINGTON
v.
TEXAS.
Supreme Court of United States.

*78 Messrs. E.R. Hoar and J. Hubley Ashton, for the appellants.
*81 Mr. Justice MILLER delivered the opinion of the court.
Waiving for the present the question whether the bonds were overdue in the sense which puts a purchaser of dishonored negotiable paper on the inquiry as to defences which may be set up against it, it is quite clear that they were transferable by delivery after due the same as before. To invalidate the title so acquired by a purchaser, it is necessary to make out some defect in that title.
The main allegation of the bill is that these are part of the bonds issued to White and Chiles, in aid of the rebellion. All knowledge of this fact is denied by defendants, and the fact itself is denied. Conceding that their denial of the fact, about which perhaps they know nothing, had no other effect than to put in issue the allegation of plaintiff's bill on that subject, it remained for plaintiff to establish its truth by evidence.
This it attempted to do. Two witnesses alone are relied on for this purpose, namely, Taylor, the Comptroller of the Treasury of the United States, and Paschal, one of the attorneys for complainants. The former was examined at much length, and gave it as his opinion, from certain calculations made by him, based upon papers in his office and *82 information received by him from officers of the State of Texas, and other sources, that these bonds were of the White and Chiles issue. He says that it is only an opinion, and it is evident from his deposition that the data on which he bases that opinion are far from conclusive. It is not worth while to waste words in proving that such testimony is wholly incompetent to establish any fact, or rather to show that it is not evidence at all.
The deposition of Paschal is to the effect that by reason of his connection with the suit of Texas v. White and Chiles, he had become familiar with a number of facts from which he had satisfied himself that these bonds were of the White and Chiles lot. As the matters on which this conclusion was founded were all of them statements of others, some verbal, some written, and all of them capable of being proved, no reason is perceived why the witness should be substituted for the court in weighing these facts, and making the proper inferences. The same observation applies with equal force to Taylor's testimony.
Not only is there no evidence that these bonds were irregularly or improperly issued, or were issued for any treasonable or other unlawful purpose, but there is evidence that there were at the time these depositions were taken, bonds greatly exceeding in amount those in controversy, issued lawfully to a railroad company, which were not identified by their numbers, or in any other manner, so as to prove that the bonds in controversy were not these bonds. Nor was there any evidence tracing all the bonds lawfully issued so as to show where these were or to repel the presumption that they were of that class. In short, the testimony on this branch of the subject is an absolute failure.
But it is said that as these bonds did not bear the indorsement of the governor of the State of Texas, this fact alone was sufficient to prove that they were unlawfully obtained from its treasury, and that the rights of the State should therefore be protected in this suit.
The opinions of this court in the cases of Texas v. White *83 and Chiles,[*] and Same v. Hardenberg,[] are much relied on in support of this proposition, and in fact are supposed to control this case in all respects. But while it is true that the bonds in question in both those cases (they were, in fact, but one case) were the bonds delivered to White and Chiles, and that some very important questions were decided concerning the relation of the State of Texas to the Union, and the validity of her legislation while under control of the enemy during the war of the rebellion, it is also true that the very matters of which the present bill is full, but of which there is a flat denial and no proof whatever, were supported in that case by sufficient evidence. On an examination of the report of that case it will be seen that the court was of opinion that it was established both in evidence and by the answers of some of the parties that the bonds then in controversy were all of them issued to White and Chiles, and the illegal contract on which they were issued was in evidence, and the court was further of opinion that the parties defendant had notice of those facts.
It is true that in the first of these cases the eminent judge who delivered the opinion, in addition to deciding that the bonds were overdue when delivered to White and Chiles, and for that reason subject to an inquiry as to the manner in which they obtained possession of them, gave as an additional reason why defendants could not hold them as bonâ fide purchasers, that they had not been indorsed by the governor as required by the statute of Texas. And for that purpose he entered into an argument to show that the State could by statute, while those bonds were in her possession, limit their negotiability by requiring as one of its conditions the indorsement of the governor. He also said in reference to the repeal of that statute by the rebel legislature of Texas, in view of the supposed treasonable purpose of it, that it was void. All of this, however, was unnecessary to the decision of that case, and the soundness of the proposition may be doubted.
*84 In the subsequent case of Texas v. Huntington,[*] which was an action at law in reference to some of the bonds in the same category as those now before us, the justice who delivered the abovementioned opinion, qualifies it so far as to say that the repealing statute, though passed by a rebel legislature, is not void in its application to bonds not issued for treasonable purposes. This is sufficient to relieve the present case of any embarrassment growing out of that branch of the opinion in the case of Texas v. White and Chiles.
This latter case, Texas v. Huntington, on a careful examination of it must be held to dispose of the one before us. It is said, among other things, "that no one other than a holder of the bonds, or one who having held them has received the proceeds, with notice of the illegal transfer, for an illegal purpose, can be held liable to the claim of the reconstituted State." Again: "Whether there was evidence in the present case establishing the fact of the unlawful issue and use, and the further fact of notice to defendants, within the principles heretofore laid down, as now explained and qualified, is a question for the jury."
In the case before us, which is a suit in equity, it was a question for the chancellor, to be established by evidence. As we have already said, there is no proof either of the unlawful issue or use, or purpose, nor of any notice to defendants of the probable existence of these facts.
DECREE REVERSED, with directions to
DISMISS THE BILL.
Mr. Justice SWAYNE:
I concur in the judgment of the court just announced, but as the case involves important legal principles I prefer to give my views in a separate opinion.
Pursuant to the act of Congress of September 9th, 1850,[] the United States issued to the State of Texas their bonds to the amount of five millions of dollars. They were denominated on their face "Texas Indemnity Bonds." They *85 all bore date January 1st, 1851. Each one was for $1000. It was certified on their face "that the United States of America are indebted to the State of Texas or bearer" in that sum, "redeemable after the 31st of December, 1864 with interest at the rate of five per cent. per annum, payable on the first days of January and July in each year, at the Treasury of the United States, on presentation and surrender of the proper coupon hereto attached," and that the bond "is transferable by delivery." Coupons were attached extending to December 31st, 1864. Texas received them and placed them in her treasury. On the 16th of December, 1851, her legislature passed an act whereby it was provided "that no bond issued as aforesaid, as a portion of the five million of stock payable to bearer, shall be available in the hands of any holder until the same shall have been indorsed in the city of Austin by the governor of the State of Texas." A large portion of the bonds were indorsed by the governor and disposed of pursuant to other acts of the legislature. Acts were passed from time to time appropriating other portions for different purposes. Some of these acts prescribed a different mode of transfer, and some were silent upon the subject. Transfers were made in such cases without the governor's indorsement. On the 11th of January, 1861, the provision requiring his indorsement was repealed. On the same day a military board was created and authorized to prepare the State for defence, and for that purpose to use the bonds still in the treasury to the extent of a million of dollars. This action was taken by the State with the view of engaging in the war of the rebellion, then impending, against the United States. On the 12th of January, 1865, the military board entered into a contract with White and Chiles, in pursuance whereof $135,000 of the bonds were sold and delivered to them. On the 15th of February, 1867, the State of Texas filed in this court an original bill against White and Chiles and others, wherein it was charged that the repeal of the requirement of the governor's indorsement and the contract with White and Chiles were in aid of the rebellion and therefore void, and it sought to recover back *86 the bonds or their value from White and Chiles and the other defendants to whom it was alleged White and Chiles had transferred portions of them. This court decreed against White and Chiles.[*] The case stood over as against Hardenberg, one of the other defendants. Subsequently a decree was rendered against him.[] The State also sued William S. Huntington, at law, in the Supreme Court of the District of Columbia, for the conversion of certain of the bonds redeemed at the Treasury, the proceeds whereof had gone to him. The State recovered as to thirteen of these bonds and failed as to the residue. The judgment was brought to this court upon error and reversed.[]
The case made in the record before us by the complainant, so far as is necessary to state it, is as follows:
It is alleged that the military board for insurrectionary purposes sold and delivered to White and Chiles one hundred and thirty-five of the bonds; that thirty-three of these bonds, after becoming past due, were sold to the bank, or were placed in its hands to collect for White and Chiles, with full knowledge of the manner in which White and Chiles had obtained them, and in bad faith on the part of the bank; and that the bonds had never been indorsed in such manner as to pass the title out of the State of Texas. The prayer is that the bank be enjoined from receiving the amount due on the bonds from the United States; that they may be delivered up to the State, if still in the possession of the bank, and if not, that the bank may be decreed to pay their value to the State. A copy of the contract of the military board with White and Chiles is annexed to the bill.
The bank and Huntington answered jointly. The answer, among other things 
Denies all knowledge of the transactions between the military board and White and Chiles; it denies that they hold or claim the bonds described in the bill; it denies that they were in any way the agents of White and Chiles or bought any bonds from them; it denies that they had any knowledge *87 that their bonds came through White and Chiles; it avers that they had heard there would be difficulty about the White and Chiles bonds, and before purchasing made diligent inquiry at the Treasury Department; that no one there could identify the bonds in question as White and Chiles's bonds, and that the bank bought them believing they were not such; it avers that they knew the Secretary of the Treasury had paid similar bonds, and gives a large list of such bonds; it denies all knowledge of White and Chiles.
The court below decreed against the bank for the value of nineteen bonds and interest. Those bonds are numbered in the decree as follows: 4226, 4227, 4229, 4703, 4705, 4706, 4748, 4813, 4825, 4843, 4844, 4912, 4927, 4928, 4929, 4960, 4961, 4962, and 4963.
The bank removed the case to this court by appeal, and it is now before us for review. The complainant did not appeal. This defines the ground of the controversy in this court between the parties, and narrows the circle of inquiry to the bonds numerically specified in the decree.
There is neither proof nor admission in the record of the execution of the contract of the military board with White and Chiles. It must, therefore, be laid out of view.
Averments by the complainant, vital in the case, are denied by the answer. The answer is responsive and the denials absolute. This throws the burden of proof upon the complainant, and the denials are conclusive unless overcome by the testimony of two witnesses to the contrary, or the testimony of one witness, and circumstances established otherwise equal in effect to the direct testimony of another.
The effort of Texas to leave the Union was revolutionary. All her legislative acts for the accomplishment of that object were void. Her position has been aptly resembled to that of a county in rebellion against the State.[*] While her enactments outside of the sphere of her normal authority were *88 without validity, those within it, passed for the ordinary administration of her powers and duties as a State, had the same effect as if the rebellion had not occurred. The latter principle springs from an overruling necessity. A different rule would involve the dissolution of the social compact, and resolve society back into its original elements.
The repeal touching the governor's indorsement was an act of ordinary legislation. It was, therefore, within the rule last mentioned. If it had in view the promotion of the rebel cause it was too remote from that end, and its tendency too indirect to render it fatally liable to that objection. The repeal put an end to the existence of the restriction. But if the restriction had not been repealed I cannot admit that the want of the indorsement would have in any wise affected a bonâ fide holder, or in other words, one who had honestly bought the bonds for a valuable consideration without knowledge of any infirmity in the title of his vendor. The United States made them payable "to the State of Texas, or bearer." Delivery passed the title. Texas could not restrain their transferability in the markets of the world, according to the law merchant, in any case without bringing home notice to the party sought to be implicated or putting upon the bonds something which must necessarily operate as a notice to every buyer.
Winston v. Westfeldt[*] has an important bearing upon this subject. There the holder of a promissory note had been enjoined from transferring it. He transferred it, underdue, by indorsement. The indorsee gave a valuable consideration and took it without notice of any defect. It was held that the title of the indorsee was valid, notwithstanding the injunction.
The fact that the bonds were overdue when the bank bought them does not affect the case. The transferee of overdue negotiable paper takes it liable to all the equities to which it was subject in the hands of the payee. But those equities must attach to the paper itself, and not arise *89 from any collateral transaction. A debt due to the maker from the payee at the time of the transfer cannot be set off in a suit by the indorsee of the payee, although it might have been enforced if the suit had been brought by the latter.[*] The result is the same whether the transfer be made by indorsement or delivery. But the protection of this principle is confined to the maker or obligor. It does not apply as between successive takers. Actual notice is necessary to affect them. There is no adverse presumption. Each one takes the legal title, and his equity is equal to that of his predecessors. "The equities being equal, the law must prevail."[] The position of the transferee must be at least as favorable as that of the assignee of a chose in action. There the assignee takes subject to the equity residing in the debtor, but not to an equity residing in a third person against the assignor.
Chancellor Kent, speaking of this rule in this class of cases, says: "The assignee can always go to the debtor and ascertain what claims he may have against the bond or other chose in action which he is about purchasing from the obligee, but he may not be able with the utmost diligence to ascertain the latent equity of some third person against the obligee. He has not any object to which he can direct his inquiries, and for this reason the assignee, without notice, of a chose in action, was preferred in the late case of Redfearn v. Ferrier et al.,[] to that of a third party setting up a secret equity against the assignor. Lord Eldon observed in that case that if this were not so no assignment could ever be taken with safety."[§] This reasoning is strikingly applicable in the case before us. It was the duty of the cashier to inquire at the Treasury Department. He did so, and learned that there was no objection to any of the bonds but those which had been delivered to White and Chiles, and he became *90 satisfied that those involved in this controversy did not belong to that class. It was impossible for him to find and consult all those through whose hands they might have passed before they were offered to the bank.
If negotiable paper, underdue, be in the hands of a bonâ fide holder, any subsequent holder may avail himself of that fact against the equity of the maker.[*] Every holder is presumed to have acquired his title before the maturity of the instrument and bonâ fide. The burden of proof rests upon the party alleging the contrary.[] It is only in case of dishonor that the equities of the maker, or obligor, can be set up against a bonâ fide holder. It may be doubted whether these bonds belonged to that class.[] I have preferred to consider the case in this aspect, upon the hypothesis most favorable to the complainant. It is unnecessary to resolve, in this case, either way the doubt suggested.
The rights of the holders of commercial paper were largely considered by this court in Goodman v. Simonds,[§] and in Murray v. Lardner.[] What was there said need not be repeated.
It remains to consider the case in the light of the evidence. In order to maintain the decree it is necessary for the complainant to establish the following facts:
(1.) That the bonds specified in the decree were of those disposed of by the military board to White and Chiles;
(2.) That the transaction was in aid of the rebellion;
(3.) That the bank, before it bought, had notice of the infirmity of the title of White and Chiles.
And these facts must be established by the measure of proof requisite to overcome the responsive denials of the answer.
It is shown by the complainant's own testimony  and there is none to the contrary  that six of the bonds here in *91 question were transferred and delivered by the authorities of the State pursuant to an act of the legislature to the Southern Pacific Railroad Company. They are numbered 4703, 4705, 4706, 4748, 4813, and 4825. It is proved by thé same testimony that four more were not of those delivered to White and Chiles. They are numbered 4960, 4961, 4962, and 4963. It is also proved that five of the bonds, Nos. 4843, 4844, 4927, 4928, and 4929, were sold to the bank by Jay Cooke & Co. It is not shown when Cooke & Co. acquired them. It is, therefore, presumed they bought them underdue and bonâ fide, and their title enures to the benefit of their vendee. Three of the bonds, Nos. 4226, 4227, and 4229, were bought by the bank of Wolf. There is some testimony tending to show that he bought after they were due. But there is no such proof as to his vendor. The presumption as to the latter is, therefore, otherwise. This ends the controversy as to these eighteen bonds. The remaining bond is No. 4912.
The only testimony in the record in any degree adverse to the bank upon the points in issue, is that of Comptroller Taylor and that of Judge Paschal.
In his examination-in-chief the comptroller said:
"From all the circumstances, my opinion is those were of the White and Chiles bonds. That is only an opinion, however."
On cross-examination:
"Q. Do you know, of your own knowledge, that White and Chiles, or either of them, ever saw one of these bonds?
"A. I know it only from the papers on file in the department; that is, from my opinion of what those papers show.
"They are too numerous for me to present here now, and I might add, that one would have to study them very carefully, and make his calculations as to the different bonds.
"It would be by taking the seven hundred and eighty-two bonds that were not indorsed, and tracing them back by the evidence into the hands of those parties who held them at different times, and ascertaining, in some instances, the particular numbers that were known to be in the hands *92 of particular parties before the transaction between White and Chiles and the military board, and taking others, again, that came from the State of Texas, and then drawing my conclusions as to what were White and Chiles's bonds."
With these admissions before us it is sufficient to remark that his testimony is clearly incompetent.[*] And, if not so, it would be insufficient to maintain, in behalf of the complainant, the issue between the parties. The same remarks are applicable to the testimony of Judge Paschal. So far as it affects this case it is liable to the same objections. He says, among other things: "I was employed by Governor Pease to prosecute this suit, and caused it to be instituted in 1868; and judging from a careful examination made in Texas, and in the Treasury Department here, I feel confident that the bonds redeemed for the bank, described by Mr. Taylor, were a part of the bonds which passed through the hands of White and Chiles, and I judge this from the circumstances which he has stated." This is mere opinion, founded upon data not disclosed and in part upon the opinion of another witness. Further remarks upon the subject are unnecessary. There are other defects in the evidence for the complainant, but it is unnecessary to advert to them. Altogether it fails wholly to sustain the case made by the bill. The decree of the court below is, in my opinion, properly reversed.
NOTES
[*] 7 Wallace, 718.
[] 10 Id. 68.
[*] 16 Wallace, 402.
[] 9 Stat. at Large, 446.
[*] 7 Wallace, 700.
[] 10 Id. 68.
[] 16 Id. 402.
[*] Hickman v. Jones, 9 Wallace, 197.
[*] 22 Alabama, 760.
[*] Burrough v. Moss, 10 Barnewall & Cresswell, 558; Whitehead v. Walker, 10 Meeson and Welsby, 696; Hughes v. Large, 2 Pennsylvania State, 103; Gullett v. Hoy, 15 Missouri, 400; Story on Bills, § 220.
[] Judson v. Corcoran, 17 Howard, 614.
[] 1 Dow, 50.
[§] Murray v. Lilburn, 2 Johnson's Chancery, 443.
[*] 3 Kent's Commentaries, 92; Chitty on Bills, 221; Smith v. Hiscock, 14 Maine, 449; Fairclough v. Pavia, 9 Exchequer, 690; Oulds v. Harrison, 10 Id. 579.
[] Byles on Bills, 165.
[] 9 Opinions of the Attorneys-General, 413; 11 Id. 332.
[§] 20 Howard, 343.
[] 2 Wallace, 110.
[*] Armstrong v. Boylan, 1 Southard, 76; Morehouse v. Mathews, 2 Comstock, 514.